We'll move on to our next case, which is the Miller Estate v. Marberry. Mr. Warren. Good morning. May it please the court. The parties in this case dispute several critical facts. Let me ask you a question, though. Did Miller ever have an autopsy? Miller passed away in the hospital. So his estate, his brother and sister-in-law are here, and they're in the process of attempting to obtain his medical records from the hospital. I don't believe a formal autopsy was done. There was a request to the prison to do that, but presumably because he died in the hospital. But there doesn't seem to be a known cause of death? At this point, I don't know, and I don't believe his estate knows either. At this point in time, I don't know the cause of death, and I do not believe his estate knows the cause of death either. I think the hospital and the prison likely do, but they have not communicated that information to us. Well, wouldn't it be important to you to know the cause of his death? It is important to us, absolutely. Well, why hasn't it been determined? I don't understand. Well, I think the estate's in the process of trying to get those medical records. I think the estate is in the process of trying to get those medical records to determine that. Does that mean we should wait? I don't believe so. Not can we decide it, but isn't it significant that if he died because of this repeated falling on his head, that that would be germane, wouldn't it, if he died of unrelated causes? Well, Your Honor, I think it could very well be germane on remand in the district court, and the family and the estate may wish to add a claim for wrongful death in the event that his death did result from the injuries, but that's not a fact we know at this point in time. And on the record that this court is presented with, there's ample disputes of critical facts to send this back down and allow the case to proceed and perhaps to have a wrongful death claim added to the complaint. But at this point in time, we simply just don't know why Mr. Miller passed away, unfortunately. I will note that it was several years after the falls and the injuries resulting from those falls, so there is, of course, a possibility that it was unrelated to his injuries. It may have been because of his brain tumor. It may not have been because of his injuries. We just don't know. What we do know at this point in time is that Miller presented credible evidence that at the time of his falls, the prison's electronic recordkeeping system reflected a doctor's lower bunk order. Counsel, you begin there, and that's the structure of your brief. Are you making a claim directly under Estelle against Gamble, or are you saying that there is some constitutional rule that everyone else at a prison must implement lower bunk permits? Well, I'm making a claim based on Farmer v. Brennan and Estelle v. Gamble, which is that prison officials cannot be deliberately indifferent to serious medical needs. All right. Then if that's the claim you're making, you would have to say, and anybody who knew about a lower bunk permit would know that there was a serious medical condition. Is there anything in the record that would support that link? Well, the link is that if an officer— No, just address the question in the way I phrased it. Does anything in the record show that lower bunk permits are issued exclusively for serious medical conditions? No, lower bunk orders are not issued exclusively for medical conditions. Then the lower bunk permit does not by itself mean that everybody who knows about the lower bunk permit knows about a serious medical condition. True. I'm trying to figure out how one puts these things together. Right. There's more here than just the lower bunk order. There's the fact that Miller told the officers that he had a brain tumor and that the lower bunk order was entered specifically to avoid injury resulting from his medical condition. So it's not just that he had a request for a lower bunk order for some other unrelated reason. And I should add, I don't actually know what other reasons those might be for getting a lower bunk order. That's, one would think, an essential matter. Well, Your Honor, I disagree because I think here the record shows that Miller had a serious medical condition and communicated that to the officers repeatedly. And told them all you need to do is check the system and you'll see that the doctor put in an order granting me a lower bunk on account of my medical condition. But his medical records don't bear that out. The medical records don't show a low bunk restriction until December and the second fall in which he sustained the injuries was in February. Well, Your Honor, I disagree with that. So what the defendants have put in the record is something called a medical duty status form. Now, as far as I can discern, that's not in any way, shape, or form a comprehensive review of what appears in an inmate's sentry file that appears to be a form to enter a new restriction into a system. So it doesn't tell you what was there at the time. And, in fact, the affidavit introducing that document concedes that it is, quote, a part of the Bureau of Electronic Medical Records on file for Mr. Miller. So we don't know what that says. And there's good reason to think the date on that form is, in fact, mistaken. It's dated December 18, 2008, but there's no reason he should have received a medical duty status on that date. We do know he entered FCC Terre Haute on December 18, 2007. So that date matches up. Well, right, but the December date when the entry appears corresponds roughly to his return to the prison from the second surgery, does it not? It does not, actually. He went in for the second surgery around December and only came out of the hospital in April of the following year. So he was there for four months to recover from that second surgery. So that would have been, I mean, as far as the timing. When was the first surgery? I believe the first surgery was sometime in, you know, Your Honor, I apologize, but I don't know that off the top of my head. It was prior to that time. But do we have any documentary evidence from the Sentry System or the medical records that shows an earlier low bunk restriction from either the medical unit or in the Sentry System? What we have is a statement from Defendant Marbury. I'm talking about documentary. I mean, this is something that there should be documentary evidence of if such a restriction existed. Maybe there would be, maybe there wouldn't. It depends how they kept their system. Now, I can't say if they kept their system well, whether it was maintained properly. But it's the plaintiff's burden to put in the required proofs. And when those proofs are documentary, we would expect to see them. A statement that I think it's there is not good enough. Well, Your Honor, on this record, at the summary judgment posture, you know, the plaintiff's evidence has to be believed. Now, he has more than just his own recollection, his own deposition testimony, although standing on its own, that should be sufficient. He has statements from the defendants saying since January 29, 2008, you have had a lower bunk restriction. Hence, we're denying your grievance. You're coming back to where my question was. The fact that somebody has a lower bunk permit does not, by itself, create a constitutional entitlement to a lower bunk. What I'm thinking of, something that parties' briefs don't discuss, is the Supreme Court's decision in Castle Rock against Gonzales. The court enters a protective order saying that A has to stay away from B. And other people in the state don't enforce that. The Supreme Court held that there's no constitutional right to enforcement. Just because state actor number one says something, that doesn't mean that state actors number two, three, four, five, etc., must ensure that that order is carried out. But that's the problem I'm having with your argument. It is that since public official number one, the physician, issued this lower bunk permit, anybody who didn't see that it was carried out is personally liable. Well, Castle Rock expressly rejected that line of reasoning. And I'm having trouble seeing why it's any stronger here. Well, Your Honor, the difference here is that this is a medical restriction. The officers were specifically informed. The restriction in Castle Rock was if A and B are not separated, B is going to get murdered. You don't think that's serious? I think it's serious, but I don't think it's health-related. And the cases from the Seventh Circuit specifically say if there is a health-related restriction. That's between the Supreme Court and the Seventh Circuit. I understand. I understand. And I apologize I did not come prepared knowing that specific case. If we're thinking about this in the framework of Estelle, then the need is to show that the actors knew of a specific serious medical condition and were deliberately indifferent. But that's why I'm asking my series of questions, because the nature of your brief is not they knew of a serious medical condition. The nature of your brief is they knew of the lower bunk pass. Well, they knew of a serious safety risk arising from a medical condition. So this is, in a sense, a blend of a serious medical risk and a serious safety risk. And there's, you know, slightly different standards that apply to each. But in this instance, he had a lower bunk pass because of a medical condition. Now, there is a case, Jones v. Symec, from 1999, in which this— Did they all know he'd fallen out of his—fallen on his head? He told them, yes. He told them after the first fall. Pardon? So they know he'd fallen on his head, fallen out of the upper bunk and fallen on his head. Yes, Your Honor. Yes, that was specifically— That's really the case, isn't it? I'm sorry? That's really the case. Yes, it is the case. If you know something like this is going on, you have to do something. It's a simple case. It's a simple case. They said—he told them, I have a brain tumor. I can't feel on one side of my body. Please don't put me in the upper bunk. I'm going to fall off. Then they didn't. Then he did fall off. They put him back in the upper bunk anyway, and he fell off again. And he got really, really hurt. It's about as straightforward a case as you can have in some ways. They knew these things. They failed to take the most minimal, costless action they could have taken, which is to just check the system. And had they done so, there's a dispute of fact over what the system said. But on this posture, our version has to be taken as true. The system said the doctor entered a lower bunk order, specifically because of this guy's brain tumor. So that's all they had to do. And then the further action would have been to just put him in the lower bunk, another thing that would have been costless, free, easy to implement, to avoid a serious safety risk. I know you came to this case late, so you're not responsible for decisions made earlier in it. But does the record show why the plaintiff didn't sue the person who was actually responsible for bunk assignments? The record doesn't show that. My best educated guess, coming to this case late, is that he didn't know who that person was. Yeah, well, but part of the problem is, if there was a real responsible person here, it's that person. Well, Your Honor, I don't agree with that. The unit team works as a team. He didn't sue the unit team. He sued two particular people, one of whom was a guard who had no authority over bunk assignments, and the other was the warden, who also doesn't make bunk assignments. He sued the people he told. He sued the people who knew. Look, the Supreme Court held in Ashcroft against Iqbal that being told does not equate to liability. It is not enough, and we reiterated this in Vance against Rumsfeld in our en banc decision, that if somebody tells somebody else, that doesn't make the somebody else liable. It doesn't change the nature of the hierarchy. It doesn't change who has what duties. You can't force liability on somebody by telling him something. That's the core holding of Iqbal. Well, I mean, this court, as recently as this year, which is years after Iqbal, has examined situations where someone was told something who didn't have the exact authority to address it and found that there was Bivens liability. So you think we've overruled the Supreme Court? I don't think you've overruled the Supreme Court. Do you have any way of reconciling your position, at least with respect to the warden, with what Iqbal actually held? I think what the Supreme Court has held is that if someone knows about a serious mental condition, knows about a problem, recklessly disregards that issue, that's an Eighth Amendment violation. Iqbal held the opposite. That's why it was Ashcroft v. Iqbal. The Second Circuit had held in Iqbal exactly what you just said, and the Supreme Court reversed. Understood, Your Honor. There's no further questions at this time. I would like to reserve the rest of my time for rebuttal. Thank you. Okay. Thank you, Mr. Warren. Ms. Shields. May it please the Court. My name is Gina Shields, and I'm an Assistant United States Attorney representing former Warden Helen J. Marbury and Correctional Officer Gary Rogers. There's a lot going on in this case, but the most important— Is there some reason why your brief doesn't mention Castle Rock or Vance v. Rumsfeld or Ashcroft v. Iqbal? I'm wondering whether you forfeited the benefits of those decisions. Your Honor, I simply overlooked those cases in the briefing. Your brief seems to accept the proposition that everybody can be personally liable for not implementing a lower bunk permit. I mean, that's just 180 degrees contrary to Castle Rock, but your brief seems to accept that proposition. Why don't we hold you to it? Well, Your Honor, I think that the cases that you've cited to today show that a complex warden, for instance, who is in charge of not only the USP Terre Haute where Mr. Miller was incarcerated, but also the Federal Correctional Institution and the Federal Prison Camp should not be held liable every time an inmate complains to her about a health issue. I don't understand. You have a guard who knows that someone fell out of his upper bunk on his head and the guard doesn't do anything? Well, Your Honor— That sounds barbarous to me. Well, Your Honor— All he has to do is go, you know, talk to someone on the medical staff or find out about the upper bunk, whether there's an upper bunk restriction, and say he doesn't do anything. I don't get it. Well, Your Honor, there was a system in place— People falling on their heads out of bunks and the guards know about it, they don't do anything, they don't say anything. What kind of prison is that? Well, Your Honor, a guard doesn't have to believe anything an inmate tells him, and the BOP had a system in place. What? A guard doesn't have to tell— I don't understand that. That seems to me grossly irresponsible. You have a guard who realizes someone falls out of an upper bunk and falls on his head and asks for a lower bunk and the guard doesn't do anything? I don't mean the guard is going to give him the lower bunk. The guard goes and speaks to the medical staff or someone. I don't understand that. Well, Your Honor, the prison did have a kind of informal system in place. I don't understand the irresponsibility of a guard who sees a potentially serious medical issue involving an inmate and doesn't do anything, where doing anything just means talking to someone, telling a medical person about this. What kind of person doesn't say anything? Yeah, fell on his head, broke his head, has a brain tumor. It's not my business. I'm just a guard. That's what they teach these people in prison, these guards? No, Your Honor, and the prison had a system in place where when an inmate received a lower bunk restriction or another restriction— I'm not talking about that. I'm talking about a guard who knows that someone fell out of an upper bunk on his head and the guard doesn't do anything. At that point, Miller should have produced documentation showing that he had a lower bunk restriction. Forget the lower bunk restriction. Why doesn't the guard go and tell someone, this guy fell out of an upper bunk and fell on his head? And if you said that to the medical personnel, they would do something. Mr. Miller was being seen by medical personnel. He had every opportunity to tell them and ask for another duty status form, to ask for his own medical record so he could find this form that he contends existed. But he didn't go to the medical staff. He's not in the greatest shape, is he? No, Your Honor. Maybe he's not very articulate in dealing with these people. As I say, you have the guard. The guards know about this. It seems to me, just as a matter of kind of elementary civilization, you have to follow up. You can't just ignore it. Well, Your Honor. They teach these people. Your Honor, there are many more prisoners than the guard. And the warden knows about that. She doesn't do anything. She's running the whole place, doesn't do anything. Yeah, people falling on their heads. Oh, too bad. They should be more careful in the future. Your Honor, as I said, he was being seen by medical, the medical staff, and he never requested another copy of this lower bunk pass. He never requested that they consider him again for a lower bunk pass. And the record's clear that as of December 18, 2008, two months prior to the fall, he did not have a lower bunk restriction by health services. And any lower bunk restriction would have come from health services. And if there was a restriction, it would have ended up in sentry. But if there's no restriction from health services, then there would have been nothing in sentry. What does the record tell us about what happened after the first fall and the circumstances of the first fall? According to Mr. Miller's verified amended complaint, and parts of his deposition, I believe, he says he fell from a ladder and then was. . . And what injuries were sustained? Your Honor, I can't remember specifically what injuries were sustained. Were any injuries sustained at all? He did have to go to the Union Hospital, the local hospital. And what do those medical records tell us? I do not know that off the top of my head, Your Honor. There are some medical records that are attached to Mr. Miller's amended complaint. However, I don't remember exactly what his injuries were prior to that. When he came back, he did not have any kind of neck brace or back brace as he did after the second fall in February. The record shows that Officer Rogers said he did not know what. . . his specific health conditions were during January of 2009. Why didn't he have an autopsy? Your Honor, I don't know. As far as his death, that was outside the scope of this appeal. Well, wouldn't you think a prison would conduct an autopsy of someone who dies in the prison, dies after having these unfortunate experiences falling on his head? Your Honor, my understanding is he actually died in the local hospital, not in the prison. Well, the prison obviously knew about it. Yes, Your Honor. Right? Yes, Your Honor. So they're informed this guy died, and they're not curious about the cause of death. They don't think, well, yeah, this is a guy who kept falling on his head. Maybe that's . . . did him in. Your Honor, honestly . . . Maybe they have to do something about it. So why didn't they do that? I don't know if they did or not, Your Honor. It sounds like a terribly run prison. Well, does the record establish that there were, in fact, any head injuries at all from either of these falls? I thought that there were no injuries from the first fall and, in fact, no head injuries. And that he did not fall on his head. He fell as he was climbing down. Right. And the second fall sustained or resulted in serious injuries, but they were back injuries. He broke his back. Yes, Your Honor. These were not head injuries. Yes, Your Honor. I believe that's correct, Your Honor. And that's borne out by the record? Pardon? Sorry, Your Honor. I would have to look at the actual medical records attached to his amended complaint more closely. I mean, it wasn't like he broke his neck and . . . Right. Or sustained some sort of concussion or something else that would be life-threatening. Yes, Your Honor. No, that is true. If you're trying to connect his death in 2016 to this fall in 2009, I don't think there's any indication in the medical records that they were connected. There's evidence that he had a brain tumor. Well, this also bears on the question that Judge Easterbrook was raising about what we can assume the guard and the warden knew about his condition and his needs, his medical needs. And I'm asking what the record shows about that. About what the warden and Officer Rogers knew about the medical needs. As far as the evidence that we've put forward, Officer Rogers said that he could not remember or recall what Miller's medical needs were or health condition was in January of 2009. Warden Marbury, you know, her declarations bear out that she was not in charge of an inmate's med . . . And Mr. Miller contends that he told her, you know, several times about his issues about . . . Well, that's really vague. He said he told her that he had a low bunk restriction or that he had a brain tumor or that he had had this prior fall and sustained X, Y, Z injuries. What specifically? I believe his first amendment complaint, he says he told her all of these things. When . . . All of these things being what? Sorry, Your Honor, that he had a brain tumor, that he had a lower bunk restriction, and that he had fallen from the upper bunk. However, when . . . And she did what? Your Honor . . . When he told her these things? Your Honor, she, as the complex warden of the entire institution, entire complex, she would have deferred to the judgment . . . She would have deferred to the judgment of the . . . In other words, she did nothing. No, Your Honor, it's . . . Did she do anything or did she do nothing when he spoke to her? Your Honor, there's nothing in that record indicating . . . So there's no reason to think she did anything. Well, Your Honor, there's nothing . . . I don't understand. You're a warden. You walk around. You talk to the prisoners. Prisoner says, you know, I have a brain tumor, I have this, I have that, I fall out of my bunk. You think the warden would, you know, make a note of it and mention it to the head of the medical staff or something? I don't get it. I didn't know prisons were run this way by complete indifference to the inmates. I think it helps to consider that Warden Marbury is, again, the warden of the entire complex. So she's not just overseeing Mr. Miller's institutions. She's overseeing two other institutions. Well, she's obviously walking around and talking to these inmates. So you'd think if an inmate says something, you know, really dramatic, I have a brain tumor, I fall out of my upper bunk, I fall on my head, you'd think, yeah, it'd be worth making a note of it and just mentioning it to your head of the medical staff. Forget about it. But just to . . . You'd think, well, yeah, this is great. The warden, you know, she's interested and so on. So I'm going to tell her this, that, the other thing, right? And if what he tells her is any kind of potential significance, you'd think as part of just good relations with your inmates, you would do a little something, costless, like tell the head of the medical staff, this guy, you know, says he's got all these problems. Look into it, right? Well, Your Honor . . . Why do these people walk around, talk? Why does a warden, this guy's got like 10,000 people, 10,000 prison inmates here. Why does she walk around and talk to inmates? Your Honor, that is not in the record. What? The answer to that question is not in the record. There's nothing in the record. Your Honor, I think what is in the record, and what's been pointed out already, is that there is a medical duty status form from December 2008 in which he does not have a lower bunk restriction. And there's been nothing, no evidence presented to her but that as of December 2008, he did not have a lower bunk restriction. Also, there is the Health Services Administrator, Mr. Rebska, he went through the record to determine if Mr. Miller did have . . . when he had a lower bunk restriction and when he didn't. And it wasn't until December 2008 when he received the lower . . . No, sorry, it wasn't until December 2009 when he actually received the lower bunk restriction. Your Honor, neither Officer Rogers or Warden Marbury were medical professionals. They were entitled to rely on the judgment of the medical professionals who were treating Mr. Miller. And as of December 2008, they did not determine that he needed a lower bunk restriction. Unless there are any further questions, for these reasons and the reasons in our brief, we would ask that this Court affirm the District Court's ruling granting summary judgment in favor of the defendants and denying Mr. Miller leave to amend. Okay, thank you, Ms. Shields. So, Mr. Warren, do you have anything further? Thank you, sir. I just have a few quick points. So, first, to Judge Easterbrook's point, the District Court below did not cite Castle Rock or Ashcroft, nor did the government, and that's why they didn't appear in our briefs. But apologies given their importance. Yes, I'm not blaming you. I mean, one might have expected Defense Counsel to rely on those cases. I can't speak to their decisions, obviously. I did want to address Judge Sykes' question about how Mr. Miller was hurt, whether he was hurt. So the medical records, which I have here, and I'm looking at Essay 211, talk about the way in which he was injured. And they say he had cervical disc degeneration and herniation, and they say he had spinal cord compression. So up here on account of the second fall. It's not just that his back was hurt. That's the second fall. That's the second fall. What about the first fall? So the first fall shows that he had a laceration, and then he was bleeding from his head. He was taken on a backboard to the hospital where he received a CAT scan. I don't have the results of that CAT scan. They're not on the record. But he did come back, I think, within 24 hours back to the prison. With no braces or assistive devices of any kind. That's correct. There were no braces or assistive devices. But, of course, he was hurt. He did fall. And the second time around he was very hurt. And it's not just a question of his back. It's also that the spinal cord was severely compressed. And the surgery that he ultimately received resulted in him being hospitalized for four months. And that was surgery on account of the second fall. Right. There's no question the second fall was extremely serious. Right. And that's the risk that the prison officials were in a position to avoid when they knew what could happen. Now, it's good fortune that on his first fall he wasn't injured more. But at that point, the officers could have said to themselves, geez, this could really result in a problem, and they could have headed off. Instead of doing something, they did absolutely nothing. Now, I want to speak to Ms. Shields' point that there's no evidence to rebut that there was no lower bunk restriction as of December 2008. That's just not true. We have a statement from Warden Marbury, and it's not that she just says there was a lower bunk restriction on X date. She says since, since, and that word is critical, since January 29th, 2008, you have had a lower bunk restriction. She writes that in 2010. That suggests a continuity of that restriction, and that's not some harmless potential error. That was the basis for her denying his administrative grievance. The basis. Now they're turning around and saying, well, we can't be liable under Bivens because there was no lower bunk restriction. They're basically trying to have it exactly 180 degrees from one another. Their positions are totally self-contradictory. Now, if they wanted to present that issue at the time, then maybe the administrative grievance would have worked out differently. As I think you all know, the Prison Litigation Reform Act requires prisoners to surmount a number of grievance processes in order to even show up to district court. There has to be some sense that those grievance processes are reliable or in some way fair, and not that the prison can just articulate one version of the facts and then show up a few years later and articulate a totally contradictory view and say, well, we don't have any of the documentary records, so you lose. It's incumbent on them to maintain a competent record-keeping system that's reliable, and if they say what the records show, then we're entitled to rely on that. In any event, I think what this argument does demonstrate is there are a lot of disputes of facts here, and that should have precluded summary judgment. So for that reason, I respectfully request that the court remands this case. There's no further questions. Thank you for your time. Thank you very much, Mr. Warren and Ms. Shields.